U.S. Department of Health and Human Services. Next arguments will be in three consolidated cases, numbers 24-1819, 24-1820, 24-1821. AstraZeneca Pharmaceuticals against Secretary of the United States Department of Health and Human Services. Bristol Myers-Squibb against the same defendant and Janssen against the same. We're going to hear from six different counsel in this marathon argument. And just to make sure that we're clear, I'll invite counsel to correct me if my understanding is inconsistent with theirs. But we're going to have 20 minutes for Mr. Roth speaking for appellants on the Fifth Amendment issue. 20 minutes for Mr. King speaking for appellants on the First Amendment issue. And then 20 minutes for Ms. Stetson on behalf on the AstraZeneca case. And for appellees, we're going to have Ms. Potty for the Fifth Amendment issue and the First Amendment issue, double duty. And then Ms. Powell on the AstraZeneca case. So far, so good. All right. Mr. Roth, welcome. Thank you, Your Honors. May it please the court, Yakov Roth on behalf of BMS. And I will be addressing the Takings Clause issues this morning. I'd like to reserve four minutes for rebuttal. Thank you. I'll start with the big picture. Under Medicare, the government has the obligation to pay for prescription drugs for some 60 to 70 million Americans. The goal of this program is for those people to get those drugs without the government paying market price. And it accomplishes that goal by ordering the manufacturers to provide Medicare beneficiaries with access to discounted medicines or else face government sanctions in the form of either excise taxes or wholesale exclusion from both the Medicare and the Medicaid programs. Before you tell us why the government is doing something it can't do, I want to see if I can get you to agree to some things the government can do.  Congress could pass a bill signed by the president that schedules these 10 drugs at a certain price point. I'm not sure what you mean by schedules. Well, we have prices, right? We've got chances. It has been dropped from $517 down to $197, correct? And that's Xarelto. Eliquis has been dropped from $521 a month to $231, correct? Right. This was done through CMS, right? Yeah. Congress could have asked CMS to come up with its best advice about what these drugs should cost in light of the massive purchasing power of the federal government. You'd agree that's true, right? Yes, yes. Half the market. Yes. Okay. So CMS could have gone to Congress and said, hey, we think you should not be paying $500 a month for Xarelto and Eliquis. We think we should use the government's massive purchasing power and they should be about $200 a month. Congress could pass a law saying that's the reimbursement rate. President signs it. Done. Companies can't do anything about it except say that's a good deal, not a good deal. I agree with that, Your Honor. And I'm glad Your Honor brought this up. I was going to actually start with it because I think that the government strawmans a little bit about what our argument is. We agree the government can set prices for these drugs. The government can negotiate prices for these drugs. And certainly the government doesn't have any obligation to buy products it doesn't want at prices it doesn't agree to. So we don't disagree with any of that. So really isn't the whole case about the exit that you're just tied in knots and you can't get out? The case is about the sanctions that we face if we don't agree to the government's terms. So the government has the right to say if we don't like your price, we're not going to cover your drugs. And the government can say, look, we think the price should be $200 a month. If you don't agree to that, you're off the list. We're not going to pay for Eliquis or Xarelto anymore. No problem. But we have the corresponding right to say if we don't like the price that you have set, we don't have to sell it. And the problem with this program, the constitutional problem with the program, is that it punishes the manufacturers if they do not agree to provide the products at that price. And that is a taking. And what I thought I would do is walk through the options that a manufacturer has. Well, I think we know the options. I mean, you've got a difference of opinion with the government about the extent of the excise tax. You say it's in the thousands. They say it's – but their numbers are still so high. Yeah. It's actually not a difference about the amount. It's a difference about what you call it in terms of the percentage. There isn't a disagreement. And it would be billions of dollars. And that's the thing that the CBO scored and said, we're not going to get any money from this. Okay. So let's set that aside for a minute. You know, the government is saying, as I read the statute, that if you want to opt out, if these companies want to say, you know what, we just can't make money on Xarelto and Eliquis at these price points, we're going to get out. The problem is that the statute as written says that if you announce that decision before January 31, then you're stuck for 11 months. And if you announce that decision after January 31, you're stuck for 23 months. Correct? That's right. Okay. Now, the government's response to that is, well, that's not quite right because we've done some regulatory work and the agency is saying, we're not going to do that. We're going to let you out within 30 days. Right? That's right. And I guess your answer is maybe. We can't trust it. But why? Why is that illegal? Is it simply because the regulation is written in derogation of the statutory language? It is, Your Honor. But I'd actually like to suggest there's a bigger problem with the exit option, even setting aside the timing. I do think the timing matters and I'll come back to it. But I want to start with what I think is the bigger problem, which is the statute does not give us the option to say, you know, we don't like your price for Eliquis. We're going to pull Eliquis from Medicare. There's no option for a single drug to be withdrawn. You're out of the whole program. It's the whole program. And it's also the Medicaid program. And it's all products. Why can't the government do that? Going back to my initial example, couldn't the government pass a law that says any supplier that doesn't agree to our price point on drug A is banned from the Medicare Medicaid market? Couldn't the government do that under its sovereign power? I think it cannot. And I think that's actually what the case in some ways really boils down to, because that is an unconstitutional condition on the Fifth Amendment right to just compensation. So let me have any right to do business with the government in the first place. And that is always true in every unconstitutional conditions case. You don't have any right to govern job. You don't have any right to govern contract. But the government cannot condition those things on the surrender of a constitutional right unless there's a close enough connection between the two. That's what the Supreme Court explained in Koontz and in all the other cases about unconstitutional conditions. So starting with a more extreme hypothetical, just to illustrate the point, government couldn't say to a defense contractor, you know, we're not going to buy weapons for you anymore unless your CEO goes on television and announces that he supports the president's policy on Ukraine. OK, that would be it. I don't think that hypo is close to these facts. Wouldn't a better hypo be we're not going to buy really expensive, really high margin products from, say, Boeing. I don't know what those products might be. I don't know weapons. But let's say let's say the high margin products are missiles of some kind. Couldn't the government say we're not going to buy your missiles if you don't if you don't. Excuse me, we're not we're not going to sell you missiles. Excuse me. We're not going to buy for you missiles unless we buy from you unless you sell us your planes. Why couldn't the government tie together? Are you suggesting that the government is somehow able to commit an antitrust violation by tying the missiles and the planes together, in this case, tying drug blockbuster drug to the other series of drugs? OK, so you're absolutely homing on exactly the right issue here. And I agree that hypothetical I started with is not close to these facts. I started with it just to make the point there is a limit on what the government can do, even in the procurement space in conditioning purchases on something on the surrender of some sort of constitutional interest. So that was an extreme hypo just to make the point, because the government's position in this court is very absolutist. We can put any condition we want as long as it's in procurement. We can we can condition it. That just cannot be right under the unconstitutional conditions doctrines. Then the question becomes, OK, where is the line? What is the relevant principle? It's not antitrust because antitrust doesn't bind the government. But I think the antitrust analogy is helpful in understanding the way the Supreme Court's conditions framework maps onto this scenario. So, you know, as you know from the briefs, there are a lot of lines of cases where the Supreme Court has tried to grapple with basically the same problem in different contexts. And if I be as one example, the Nolan Dolan framework, USAID is a third. I think there's actually unifying principle, though, that ties them together and that can guide the court, which is whenever the government is putting a condition on some sort of spending or benefit. What we're trying to distinguish is, on the one hand, is this a condition that is legitimately advancing the purposes of that spending or controlling the parameters of that spending, in which case the government can do it? Or is this an attempt to leverage the government's power to tax and spend in order to induce or coerce the recipient to take some other action that we couldn't mandate directly? And the cases, I think, bear that out. So in NFIB, the court said, well, of course you can condition new Medicaid money on compliance with new Medicaid conditions. That's just controlling what you want to buy. But what you can't do is take the preexisting really significant grants that states have come to rely on for old Medicaid and say, you don't get we're going to cut those off unless you agree to these new terms, too. Same thing in USAID. No problem with the condition that said, if you take this money, you need to spend it on X, Y, not on Z. That's the government controlling the parameters of its own spending, making sure the money is doing what it's supposed to be doing. But you can't say you can only get this money if you also adopt the policy opposing prostitution because that's using the money to try to extract something unrelated from the recipient. So, you know, it strikes me that a lot of the complications in this case, a lot of your grievances in this case, come from the fact that the government is both market participant and market regulator. And so some – if you told me that – and so if we were to isolate those two, if they were only market participant and they could exact all these terms through just the force of their participatory power, their negotiatory power, no problem, I assume. You just sit there and say that they were really just a market participant. They would be bound by the antitrust laws. And they wouldn't be able to do this because it would be sort of classic tying. We have market power over A. We're going to use it to get you to do B even though you don't want to. So no matter what they – so what you're saying is they ride together a lot in this case, but no matter what, they're going to ride together a little because of the antitrust exemption. I think they ride together a lot because the government is using its sovereign power in lots of ways to make this scheme work. The excise tax obviously is sovereign power. The fact that they created the Part B program in the first place and then assumed and aggregated this market control, nearly half the spending, gave it the ability using its taxing and spending power to put itself in the position to exert this leverage. And again, we're not saying the government has no leverage or cannot ever exert leverage. So to go back to where Judge Hardiman started, if they had said we only want to pay $200 for Eliquis, you don't like it, we're not covering Eliquis, I don't think we would have a takings problem because that would not be an attempt to leverage spending to get something else. The problem here is the tying. It's the disproportionate leveraging of all the spending in two different programs from dozens of other drugs where there is no price. That happens all the time though in the private sector, so I don't understand why the government – I mean in – I understand the antitrust implications in the private sector, but I'm surprised that your argument is the tying is the problem rather than the timing. Because to me, I'm scratching my head about the timing. If the government wanted to pass those laws setting the prices, it could do so. But what I don't think it can do, I might hear otherwise from your friend on the other side, is what the government can't do is say produce millions and millions of doses of drugs, hundreds of millions of doses of drugs at X price point, and then the government wakes up one morning and says, oh, just kidding, we're going to pay you 65% less. So what am I missing? Let me address the timing because I do think it illustrates something about what's going on with this program when you take a step back. It's clear from the text of the statute Congress didn't actually intend for there to be a real exit option because of the timing. And in fact, it's only structured – it's not even structured as an option. I mean, if you look at how the text is written, it's you shall do this. If not, you hit with the excise tax. And then there's an exemption from the excise tax for suspension if you have none of your drugs covered by either Medicare or Medicaid for the periods at issue. So it's sort of like a back-end way out of the tax, but you can't actually do that without giving notice that would have had to be given before the statute was ever enacted. Because I haven't heard or seen in your briefs you acknowledge the 30-day exit for good cause provision that is in the statute as opposed to the guidance, that 42 U.S.C. 1395 W. It says that the Secretary can let people out of Medicare and Medicaid contracts within 30 days with good cause. The guidance is applying that and saying we're going to do this if you give us 30 days' notice. Why isn't – So the way – I think the right way to understand the statute is there are two different ways to get out. One is on your – because the manufacturer wants out, in which case you have to give the notice. The other is if the Secretary wants to kick you out, in which case there's a shorter window for the Secretary. And what they've done to try to address this timing problem through guidance is to say, well, we'll – if you tell us you want out, we'll kick you out so that we can take advantage of the 30 days. And we could have a debate about whether that violates the statutory terms. The point I'm trying to take is just it actually tells us something bigger about what Congress is contemplating, which is that this was never intended to be a real meaningful choice in the NFIB sense. And again, if you take a step back, all of these different aspects of the way the program is structured confirm that. We have an excise tax that they admit nobody could ever pay because it's designed to be more financially punitive than compliance. It's just a cudgel to get you to comply. And then an exit option that, at least as they wrote it, and I think the best way of reading the statutory tax is you couldn't actually invoke it. But the good cause standard is – would you agree a discretionary standard? Yes. Okay. So there is a statute that allows the secretary to allow pharmaceutical companies out of contracts with Medicare and Medicaid for good cause within the discretion of the secretary? That's right. Okay. And they've said that they would do this. In guidance, they've said even though that provision appears from its structure to be designed to be a punitive measure –  We'll give you a hearing. But you're asking them to assume that they're not going to do what they've said they're going to do? I'm not really asking for that. I'm actually just trying to make a broader point about, again, the way Congress wrote this. Even assuming they could do it this way and even assuming they really will do it this way and let people out, I think what it shows us is that – and what it confirms – is that Congress designed this program in a way that lets it treat these preexisting 50% of the market for drugs as to which there's no dispute over price, no dispute over coverage, to hold all of that hostage as leverage to force manufacturers to provide the selected property, the drugs, that are picked for the program at the low market prices. And that confirms that this is the type of unconstitutional condition that the Supreme Court has invalidated across numerous different contexts, from federalism in NFIB to real property in Noland Dolan to USAID with grants, and it's the same structure here. And that's our fundamental objection. I think the timing confirms it, but the problem goes beyond that based on the tying aspect that we were talking about earlier. Thank you. You've reserved time for rebuttal. Thank you, Your Honor. Mr. Roth will hear now from Ms. Potti. Good morning, Your Honors, and may it please the Court, Katherine Potti for the United States. I want to start by picking up on the discussion of the exit option and the timing. Judge Freeman, you are correct that the statute does allow CMS to terminate any manufacturer agreement within 30 days for good cause and have explained that if a manufacturer wants to pull out of Medicare, it may do so, and CMS would terminate that agreement within 30 days. But doesn't that vitiate B-2? That section there about by a manufacturer, termination by a manufacturer, would seem to be surplusage if B-1 means what you just said it means. No, absolutely not, Your Honor. CMS can terminate the agreement for good cause, and so the manufacturer's request under these circumstances would allow CMS to end these agreements. If the manufacturer independently wanted to terminate the agreement according to that provision in that timeline, that is true, but CMS has broad discretion under that good cause provision to terminate the agreement within 30 days. No manufacturer has suggested that they wanted to pull out of the program. However, even under their understanding of the 11-month timeline, for example, if they decided that they wanted to pull out under their understanding of the statute by January 30, 2025, they would be out of the program before any of these prices went into effect. So there's really — Only if CMS says so. No, that's under the 11-month timeline, their own understanding. That's not under the 30-day one. So they would have until January 30, 2025, under that 11-month timeline, that they understand that there is that good cause provision, which does allow CMS to pull out of the statute. So the statute with the good cause provision says that the secretary can terminate an agreement for a knowing and willful violation of the requirements of the agreement or other good cause shown. I understood Mr. Roth to be saying that, you know, the good cause has to be connected to a knowing and willful violation. What's your position on that? So that's not right, Your Honor. The courts have been clear that good cause is a capacious concept and that it does allow the agency discretion to terminate agreements for circumstances that are not narrowly specified in that statute, and that's why the good cause provision there exists. And I do want to be clear that the plaintiffs here have not suggested that that's what they want to do. It is an option that they can do. And it does emphasize the fundamental point here that participation in Medicare has always been and continues to be voluntary. Can I just pick up on that? Because I think they take a little issue with that. I think they say, no, we don't have a real choice here. In part, we don't have a real choice here because the timing, and you've addressed that. But I think Mr. Roth said timing is one of my issues. But my bigger issue is just we don't really have a choice here. It's the options that you've given us aren't real options. Either pay excise taxes that plummet us into bankruptcy or withdraw from a program in total, which just no one's going to do that is the allegation or the assertion. And so they're saying we know what coercion means. We've read NFIB. We've seen numbers of what a state budget is and how that affects. So they say if that was no real choice for purposes of the anti-commandeering analysis, NFIB, it's no real choice for us. And so if we've got no real choice, we might have an illusory choice. NFIB still had an illusory choice. Like, don't you have a problem? No, Your Honor. And I do think you are right that that is their principal contention that they are staying in the program because they know that selling drugs under these terms is enormously profitable. And I do want to emphasize this because the result of this whole relationship is that plaintiffs are walking away with taxpayer dollars in the form of significant profits. So they are literally making money off of the government here. The only pressure is that they're making a lot more before this program. And I'm sure. Can you just address what I started with here? Do you agree that Congress could just pass a law setting these prices? Yes, Your Honor. Why didn't it? Because, Your Honor, Congress balances interests all the time, engaged in this negotiation with the. It had nothing to do with laying off the political liability to an agency of unelected. Your Honor, the CMS engaged in negotiations, real negotiations with each of the manufacturers here. And in each of these instances departed upwards from its initial offer. So there was a real back and forth about these prices between CMS and the manufacturers. And that's a negotiation program. But that allows CMS to hear from the manufacturers and to consider particular factors that go into the development of these drugs when it determines how to to agree to. It seems to be so lacking in transparency. I mean, I think you may have a strong argument. I don't know, because I don't know the economics of this industry well enough. But you may have a very strong argument that they could still make a lot of money under the program, even with a 60 percent or so reduction. You could be quite right about that. But why shouldn't it just be transparent and open? Why shouldn't Congress just pass these laws and say, you know, we're a huge market participant? Basically do what Wal-Mart does, right? Or Amazon. Any big corporation has a lot of purchasing power. Everybody knows that their suppliers are squeezed very tightly and the margins are very thin because of the massive purchasing power of the company. So, too, here with the government. Government has massive purchasing power. Why didn't it just set the prices and then let the market work? And the companies can decide, yeah, I can still make money selling to the government, to Medicare and Medicaid patients, recipients, or no, the government set the price so low, I'm out. Seems pretty simple, doesn't it? So that system certainly would be constitutional, Your Honor. But I do dispute the assertion that there's a lack of transparency here that is different from other government procurement negotiations or in the private sector. Big business negotiations, large companies that buy big amounts of a certain product don't necessarily make their own negotiations public. So engaging in this negotiation process with the manufacturers is no different from that. And that's the system that Congress set up. The option to set up a different system or to simply dictate these prices from the get-go does not undermine the constitutionality of the option to negotiate these. And negotiation is a better deal at the end of the day for the manufacturers because, as we explained, CMS did go up from its initial offer in every case. So it was a real negotiation. Can I get back to NFIB? Because NFIB at least seems to say to me that this is eloquent writing, but it says, quote, the threatened loss of over 10% of a state's overall budget, in contrast, is economic dragooning that leaves states with no real option but to acquiesce to the Medicaid expansion. So it strikes me if we look at the penalties of not participating and they get to a point that looks like it's about a 10% loss of overall budget, then we've got economic dragooning, which I'm just going to call coercion. So why isn't that just kind of – we're looking for certainty here. Why don't we just look at that for certainty and say you show us that the exit consequences exceed 10% of your overall budget, and boom, we're done, NFIB? That would work a pretty fundamental change in spending clause legislation, Your Honor. The reasoning in NFIB is suffused with federalism concerns. Totally, totally. I totally agree with you. But this, 100%, is anti-commandeering. It's federalism. States quash states. Understand all that. But this isolated part just looks at coercion. That's all it's looking at is because when you get down to this outro of this section of NFIB, the question is, was there coercion? Because coercion was the issue that all the other dominoes about federalism fell on. So I know that there's many reasons to distinguish NFIB. But on this isolated issue, when we just want to know, is there a real option? And NFIB tells you that if it's 10% of your budget, it's not. So NFIB certainly does not set that rule generally. I do think that the nature of the impact of the government action here is extremely relevant to whether the coercion analysis, to whether something amounts to coercion. So the fact that these were states providing welfare benefits through Medicaid is a big part of the pressure that they would face. And here, and in many other cases, the Supreme Court has repeatedly upheld the government's ability to attach conditions to federal spending, even when the financial stakes are high, and even when it forms a significant part of a private entity's budget. So a university, for example, and many universities are deeply dependent on federal funds and their eligibility for those funds depends on a host of requirements in a number of different statutes, from the Rehabilitation Act to the Solomon Amendment. And for a lot of these universities, it would be catastrophic to lose access to federal funding, so they do not, to turn down that funding, excuse me, by refusing to comply with any requirements. I'm starting to record, but just to kind of paraphrase, what you're saying is, to me, basically, nice try, but you can't distinguish states from market participants so fast. The commentary analysis is separate, but when we want to look at coercion, the coercion analysis that we're going to do for states is just fundamentally different. So 10% doesn't translate of 10% of a state's budget to 10% of a pharmaceutical company, but there's just too many other things, and so coercion is going to be multifaceted, even if it became very singular for the Supreme Court and NFIB. That's absolutely right, Your Honor, and it is also, the alternative option would really, truly work a fundamental change in the law. The universities are a good example. There are decades of cases concerning taking claims from hospitals and nursing homes and all sorts of programs under Medicare, and the participants always argue that if they pull out of Medicare, then they wouldn't be able to survive anymore. That is the consistent argument that has been rejected for decades, and the court's decision in NFIB in that particular circumstance that was tied to the relationship between the federal government and the states does not create any rule that can just be ported over to private entities like this. Can we talk for a second about Noland-Dolan? I understand it's your position that Noland-Dolan doesn't apply in this context and doesn't apply outside of land use permitting, but if we assume for a second that it does, tell me a bit about Nexus. Absolutely. Targeting the core cost drivers of Medicare spending, which are the highest expenditure drugs that form a significant part of the budget, absolutely satisfies any Nexus requirement here. Medicare spending is not siloed by drug. It is an integrated system, and it must manage its budget across all covered medications, so the negotiation program targets the highest expenditure drugs because of their significant impact on Medicare's budget overall. This is not about leveraging unrelated products. It's about ensuring that the… If any of these companies for the top 10, the first round of 10, if Janssen said, sorry, we agreed to agree, we signed your form, but we sat down, and we just couldn't come to an agreement, and we're not going to sell Xarelta to Medicare and Medicaid, the answer from the federal government isn't, oh, that's too bad, we'll find somebody else. The answer from the federal government is we're not buying any Janssen products, correct? So, that's correct. That's leverage. That sounds like leverage 101. Well, the government is allowed to use its purchasing power, but the point is that they're not unrelated, that this is about managing Medicare's budget overall, and that the highest expenditure drugs, the ones that take the most out of Medicare's budget, is what Congress targeted in order to ensure the long-term solvency of the program. So, of course, the government is allowed to use its purchasing power. Wait, you said Congress targeted? Did Congress cite Farseega, Xarelta, Eloquist, and the other seven? Did Congress do that? No, no, your honor, it's… Congress didn't do any of it. Congress just threw the ball to CMS, right? No, your honor, Congress directed CMS to select the highest expenditure drugs for Medicare, and according to a set of… I still don't understand why, forgive me for being a simpleton, why can't Congress do this? Why couldn't Congress have some hearings, ask some questions? It seems pretty easy to discern where we're spending the money as a country, right? I mean, the numbers are astronomical on these 10 drugs. So, you have a few hearings, you figure out where we're spending all the money, and then Congress votes on the prices. So, absolutely, Congress could do that, your honor. The drug market changes over time, and drugs come in and out, and generics become available, and so… Yeah, and Congress has hearings all the time, and… That Congress could have taken this more direct route does not mean that Congress is precluded from taking a route that involves negotiations with CMS. That's just, if there's no constitutional problem… Right, right, but we… There's no constitutional problem with CMS. All right, you're certainly correct under the law as it stands that this delegation is okay, but we still have to make sure the statute harmonizes with the regs, right? That's right, your honor. And how is this exit option by a manufacturer consistent with the revised guidance that says, it seems to say, well, not really strict about the statute. We're going to do it this other way, and we'll let, trust us, we'll let you out within 30 days. No, your honor. Why is that inconsistent? Because the statute says that CMS may terminate any agreement within 30 days for good cause. And so, CMS has made clear that it would terminate the agreement for good cause. And again, I do want to emphasize that even… It sounds like a post hoc rehabilitation of a taking. I mean, isn't that a way to sort of soften the blow of the way the statute operates as written? I'm not sure what you mean by the post hoc rehabilitation, your honor. What I mean is, if the revised guidance hadn't issued, and a manufacturer said, Janssen said, Xarelto, we don't like the number. We're out. BMS said, Eloquist, we don't like the number. We're out. They can't really get out without being stuck for at least 11 months. So, under their understanding, it would take 11 months, but the prices do not go into effect until 2026. So, there is still plenty of time, though I do want to emphasize that no manufacturer has even suggested that they do want to get out. But they can get out, and these are the various ways that they can get out. But fundamentally, they are staying in the program because the government is offering them a good deal. Or maybe they're staying in the program because they hope they win their cases, and then they go back to the higher prices. I mean, there could be myriad reasons for that. That may be so, your honor. But the bottom line here is that the government is offering plaintiffs a very good deal, and that is the economic pressure that they say that they are under. The government has offered them an extremely profitable arrangement for selling drugs to Medicare under these terms. And the manufacturers are saying that this has been such a good deal for them that they cannot pull out. That would go contrary to decades of precedent, considering similar arguments from hospitals and all sorts of nursing homes. But didn't the government make the same argument in Horn? I mean, the same argument in Horn was, look, we're only taking a small portion of your raises, and you can still make a lot of money. And this works pretty well for everybody because the government has a stewardship obligation to the people. That's why we're just taking a small portion of the raisins. And the rejoinder from the raisin growers was, well, this is our property, and we're not too keen on the idea that we could, you know, sell grape juice instead of raisins. Why isn't that fairly parallel to the argument we're hearing here? The raisin growers in Horn were not trying to do business with the government. And that's the fundamental issue here in this case, is that they want to do business with the government. And the government is saying these are the terms on which we are willing to do business. All right. So I think that's a great argument. But I think it goes to the heart of whether the government is acting qua market participant or qua regulator or both. Is it your argument that the government is acting qua market participant alone? In setting these terms, yes, Your Honor. Of course, Medicare itself is a very tightly regulated program. But, yes, the government is acting as a market participant. If we disagree with that, do you lose the case? Absolutely not, Your Honor. Because if the government's regulator and market participant, then we're looking at potential coercion that could run afoul of Herne and Cedar Point Nursery, right? No, no, Your Honor, because the government, although Medicare itself is a regulated program, here the government is only setting the terms on which it will pay for these drugs. So that itself, you have to look at the aspect of the claim that they are making and what the government is tying that to. Here the government is tying that to its agreement to purchase drugs. And it has broad discretion to set the terms under which it will spend taxpayer money. And so even though Medicare itself is a regulated program, that does not change the fact that the government does not need, does not have any constitutional obligation to pay for drugs under these terms just because it has done so before. And that is fundamentally the underlying voluntariness issue here. I see that my time has expired. All right, well, we're going to see you again shortly, I think. We're going to hear rebuttal from Mr. Roth. Thank you, Miss. Thank you, Your Honor. If the statute had just said hand over the drugs for discounted prices, that would be a clear taking under Cedar Point. If the statute said hand over the drugs at low market prices or else pay a huge penalty, that would still be a taking under Horn. The only thing that's different is that there's now a third option, either hand over the drugs at low market prices or you pay penalty or you accept what is effectively debarment from this entire program and the Medicaid program. That is what distinguishes this case, and that is what and that is what triggers the unconstitutional conditions and coercion doctrines that the Supreme Court has identified. So I just want to make a few points about that doctrine. So you're saying debarment from Medicare and Medicaid, but not debarment from selling those drugs to any private persons or even debarment from selling those drugs to the Veterans Administration or other government programs. So why is that significant? You're not going to be out of business. You're able to still do business. Yeah, and so I think we need to then run that through. You're right about the premises. We need to run that through the analysis that the Supreme Court has identified in cases like NFIB and Coons for Conditions and Nolan Dolan to see how it shakes out. And so I just want to make a few quick points about that. Number one, it's clear from Unbear that the doctrine does apply to the government contractor scenario. The Supreme Court there said it spans a spectrum of relationships. We don't care if you're a government employee, government contractor, grant recipient. This is a general principle, and the Supreme Court reiterated that in Coons just a decade ago. Second, what is the core of these doctrines? What are they trying to get at? Justice Barrett explained it last term in her opinion for the court in sheets. She said what we're trying to figure out, and I'm going to quote, is whether the quote is, is it got what we're trying to figure out is whether what the government is doing is, quote, leveraging its permitting monopoly to exact private property without paying for it. This is not a permitting monopoly. It's not a permitting case. It's a monopsony over buying these drugs, and it's about a nearly 50% share of the market. But we're trying to figure out, is that what the government is doing, leveraging that monopoly or monopsony to exact private property without paying for it? And I would suggest that's exactly what this statute is doing. We know that because it is so disproportionate. It's all the drugs as to which we know that only applies. Assuming you're correct, it only applies to drugs in the pipeline. Because because we agreed up front, the government could set prices on these drugs prospectively, and there's no problem. That's not a take, but it had a business judgment as to whether you want to sell these products at the lower price. Sure, but it hasn't. So what it's doing and the way it's structured to do this is picks one drug. So for us, it's VMS, it's Eliquis. And it says, yeah, you have these 30, 40, 50 other medicines that we want to cover that you want to sell where we have no price dispute. They're for different illnesses. They're for different patients. They even cut across different programs like Medicaid. We're going to cut you out of all of that unless you agree to provide these drugs at the low market. But they could they could cut you out of all the other ones by setting prices on all those drugs that are so low you don't want to sell those either. Your Honor, the government, the government through its sovereign power could could de facto put you out of business from doing business with the government by setting prices that are so low that you don't want to do business with the government. Your Honor is correct. They could do that, but they haven't done that. I think the reason they haven't done that is because there is a political they want to have their cake and eat it, too. Exactly. So do you. Well, no, I think you want you want you want to access the massive purchasing power of the government. You want to access a market that is massive and you want to you want to access that market at a at free market pricing or quasi free market pricing. Your Honor, all we want is not to be compelled to sell a drug for a price that we don't agree to under threat of government sanction. And that is what this program does. There are lots of things the government can do. Your Honor's right to lower drug prices, to hurt us economically, to impose coercion that might not be unconstitutional coercion. But that's not how this program works. This program is designed to leverage all of this other stuff to coerce us to hand over this particular product is targeted piece of property at below market rates. And that is what violates the Constitution in a way that all of the government's other hypotheticals and examples do not. I mean, they talk about conditions on university just address what Miss Patty argued about. You know, nobody's run for the exits yet. She's right. And we don't want to run for the exits because it is basically half the market. So if we are forced to this choice, and we've always said this, if we are forced to the choice of handing over the drug at the low market prices or effectively losing access to half of the U.S. market and all of those millions of patients. Yeah, we don't really have a choice. That's really our point under NFIB and the gun to the head, which further corroborate what the government was trying to do here. It wasn't trying to give us a real option. It was trying to put a gun to the head. And contrary to counsel's suggestion, that principle does apply in the private sector as well. The Supreme Court applied it a century ago in cases like Butler. This court mentioned it in Doe, which actually was a university case. That doesn't mean you can't have conditions on government funding. It just has to be run through this analysis that the Supreme Court has laid out. You need to have the germaneness and the proportionality. And we don't have any of that here. That's what makes this unconstitutional. Thank you. Thank you, Mr. Ross. We're going to proceed to the First Amendment issue next. Mr. King. Good morning, Your Honors. May it please the court. Kevin King, on behalf of plaintiff's appellants in the VMS and Janssen cases, I'd like to reserve four minutes for a vote. Granted. Your Honors. Drug pricing is front and center in the national debate, and the Inflation Reduction Act compels plaintiffs to endorse messages preferred by the government on that issue to state in writing that they agree to the prices set through the program, that those prices are the product of negotiation and that the prices are not only fair, but the maximum fair prices for plaintiffs. What if you just were able to strike that from the agreement? That problem solved. Right. I understand why you assiduously disagree with the notion that this is the quote maximum fair price. It's sort of Orwellian as far as the companies see it. So strike it out. Sign the agreement. Strike it out. You're not speaking. Problem solved. No, Your Honor, not problem solved. Problem partially addressed. I don't want to say that that doesn't help. It does help. But the problem here comes from the manufacturer agreement, which implements the terms of the statute. The statute is the source of these obligations to speak, to say that these prices are the maximum fair prices and to say that we negotiated these prices. So, you know, the interesting thing is this phrase maximum fair price. It's a statutorily defined term. And so it seems to me that a lot of your First Amendment challenge isn't so much that you're forced to speak, but that you don't like the use of that term. If instead the statute defined a term that said the CMS, Medicare, da-da-da-da-da price, and you said that, you probably wouldn't be here quite as much because just saying that you set a technical, super technical price. No one really knows what that means. The capacity for misleading isn't really that high. Maybe you say still a First Amendment violation, just one that we don't want to vindicate. But it strikes me that it's really the choice of words that has everybody wrapped around the axle. They just should have used a different statutory definition if they called it something really obscure that was just meant nothing to anyone. Maybe it's not the case, but when you call it maximum fair price, you say, hey, that's misleading. So I guess my thought is how much of it has to do with kind of the message itself and how much of it has to do with the fact that they want you to say something? A lot of it has to do with the words that they selected. I mean these are the words that Congress selected. But I do want to make clear that this idea that it's a defined statutory term gets the government out of it. It doesn't work. That invokes Meese v. Keene, which was not a compelled speech case, as the D.C. Circuit said in the National Association of Manufacturers case. I'll just quote Meese does not suggest, much less hold, that it would be constitutionally permissible for Congress to do that, to say, well, you know, we can make you say these words, you know, as long as we define them in some kind of anodyne way. Right. Congress couldn't say to utility companies, you need to in your rate filings say that you are an irresponsible polluter as long as that term is defined in some way that doesn't have a valence to it. So I don't think the fact that it's defined really gets anywhere here. But yes, to return your point, Judge Phipps, the words matter and these words are being put in our mouths. And I think, Judge Hardiman, this goes to the transparency point that you mentioned before. Congress could have set up a regime that sets prices without agreement, without negotiations, without this performative process and overlay. It does it all the time. Congress tasks agencies to go out and to set maximum prices without those elements. And we give some examples on page 47 of JANSA's opening brief, but it didn't do that here. And you've got to ask, why didn't they do it here? Well, they didn't do it here. They took the unusual step of layering on these negotiations and these agreements because wrapping the program's regulatory approach in this language of commercial contracting makes it look like a more popular form of negotiation. It sends a message about what this program is doing. And that message has been picked up repeatedly by senior government officials from the president of the United States right on down, saying that this program has brought the manufacturers to the negotiating table, that it's cracking down on exorbitant prices. This is from the State of the Union address this year. So, Your Honors, there is a communicative element to these words that we're required to speak. And that communicative element is not just on any issue. It's on a matter of public concern, one of the leading issues of public concern. And what the Supreme Court has said is that the government cannot compel regulated parties to speak the government's preferred messages, especially on matters of public concern, unless it satisfies heightened scrutiny. A test the government hasn't even attempted to satisfy here. And so I think what that means, Your Honors, is that this case, our First Amendment claims, rise or fall on a single issue, and that is, does the First Amendment apply at all? It does, and it does for the reasons, the same reasons as an expressions here design and USAID, which is to say that these compelled statements have a communicative element. They say something about what's going on here. They are essentially a compelled public relations campaign in support of the program. The provisions that we challenge, Your Honors, they don't tell the manufacturers how much they may charge for their drugs. They tell us what we must say about the prices set by CMS. And I guess in that regard, there's one part of this that is especially injurious. By telling the manufacturers that they need to tell the world that the prices set by CMS, which by statute have to be highly discounted, are the maximum fair prices. The program is requiring manufacturers to indict their own conduct, Your Honors, to go out and to say that those market rates we've charged in the past and that we're going to continue to charge outside of Medicare, that those are unfair. And in that way, the compelled statements blur the lines of accountability for the program's effects, distort the marketplace of ideas. Is there anything that prohibits your client from going out and issuing a press release saying, you know, we signed this agreement, but the term maximum fair price is a term that we had to sign and we just don't think this is fair? No, Your Honor. There is nothing that prevents us from going out and doing that. But I would say, Your Honor, that that legally is not relevant to the analysis for the reasons that you see in Pacific Gas and Electric. The utility company could have put some inserts into its envelopes and said, you know, that newsletter we were forced to run, we don't agree with it. The Supreme Court said in footnote 11 of that case, not good enough. Well, I think maybe what comes down to is whether this is this speech and let's assume that it is speech and the First Amendment does apply generally is it is specifically tied to the conduct of sales to the government. It relates in some loose way to sales by the government, but I do want to make clear. How is it loose? This term is in the contract that you signed with the government in order to effectuate the sale. But it's in the contract only because the statute, Your Honor, says it has to be in the contract. You don't need these words to sell drugs through Medicare and Medicaid. Other drugs are sold through Medicare and Medicaid every day without the manufacturer being required to warrant that it was negotiation or that the price is fair. And elsewhere, you know, again, with the Surface Transportation Board, with FERC, you have these government price setting programs that don't require this communicative element. I mean, Congress could have communication is signing the contract, right? Yes, Your Honor. The communication is signed. So the government can call it in the statute, whatever it wants. But but if you're if your concern is that there's communication that you have to do, you have to engage in communication by signing the contract. And the contract is how to effectuate the sale of pharmaceuticals to the government. And how is that not incidental to speech? It's not incidental to conduct. Right, right, right. It's not conduct regulation with an incidental effect on speech, Your Honor. And the reason it's not is that you can achieve the same conduct, the same maximum prices for the drugs without putting words in our mouth. The Supreme Court and Sorrell gave this example. They said a law that prohibits outdoor fires would have an incidental effect of prohibiting flag burning. It's not what's intended. It's just a downstream consequence. But to think about here, what's the conduct regulation? The conduct regulation is we will buy drugs from you at a particular price and no higher than that. And you can effectuate that without requiring us to say that we negotiated the price. You can effectuate that without requiring us to say that the price is fair, much less the maximum fair price. So you can get all the conduct the government wants here, all of it, without this overlay of communication. And because that's the case, it necessarily is not some incidental effect on speech. It's regulating speech. It has the same effect, Your Honor, as an expressions hair design where it's not about. Can we order the government to change the terms of the contract to change, but not the material terms, but the problematic language that you've identified? No, Your Honor, you cannot. And the reason you cannot is that the statute has these terms. And this court lacks authority to modify or blue pencil the statute. And so you can declare that these problematic provisions are unconstitutional. The agreement just say, you know, use different words and say, you know, we're exercising this. We're executing this agreement under the statute type of statute. Well, I don't think you can do that because the statute channels everything through this negotiation and agreement process. It says this is 42 U.S.C. 1320 F dash to a one that everything runs through this manufacturer agreement and that the manufacturer agreement needs to say we're going to negotiate a what a maximum fair price. And so the agency can't just fix this by using different words in the document that you sign, because the words that that document must use is in 1320 F to a one. So but it doesn't doesn't all of this kind of depend on voluntariness versus coercion. If if you said, hey, zero course of effect, we just we just had to do this. We wanted the contract. Everything else was fair. Right. You know, no, no exit penalties, nothing else like this. We didn't want to do it, but it's a negotiation. It was a fair negotiation. We have to give some things up. You know, we have to do these other things. So I guess what I'm saying is isn't kind of, you know, the unspoken first argument that it's that it's a course of process. And if it's not a course of process, then then why shouldn't we just sit there and say, OK, you know, those are the terms the government wanted. You choose you chose to accept them. You know, it almost feels like you didn't get everything you wanted in negotiation. And you come to court and say, can we get can we get out of the negotiation? It seems that you have to show coercion or or some sort of duress or something like that. Am I wrong or is there some angle here that says no voluntariness is still tangential. And even if it's totally voluntary, there are certain things that the government can't just ask of people when it contracts with them. What are you on that? I would I think you're right that there needs to be actual compulsion. That's the term this court used in Ridgewood. That's the CN case, which had to do with students sitting in school and having to fill out a survey. That's the test. This court applied in Miller. You need some kind of compulsion, but compulsion isn't a legal requirement. This court said in Ridgewood, it's not a gun to the head. What it needs to be is some kind of indirect discouragement like fines, taxes, penalties, exclusion from a program. That was the coercion in the Axon case from the 10th Circuit that this court relied upon in Ridgewood and in Miller. And the compulsion in action, I think, is especially instructive because the acting student there had to either utter the objectionable phrases, expletives and so forth, or be excluded from the training program. Here we have to say the things that the statute says we must say, or we're out of Medicare and Medicaid, or alternatively, we can pay excise taxes. So we have exactly the kinds of compulsion that you would need to make this compelled speech. If the speech is not compelled, there's no First Amendment issue. So is the – yeah, good, good. So is the compulsion analysis the same as the coercion analysis for the takings clause for purpose? Or I get the sense that you're telling me it might be a softer standard to show compulsion than it is to show coercion. Those words are synonymous in my head, but that never stops the law. It is a softer standard, and a softer standard you know from the Supreme Court and USAID where they say – I believe this is either page 218 or 219 – where they say it need not be an offer you cannot refuse. It need not be coercion in that sense. It's something less than that. And again, Ridgewood and Axon make clear that it's something less than that. So it is a lower standard. But I don't think the standard especially matters here because for the reasons Mr. Roth gave, we've got the higher level of coercion here. My point is we win either way. Even if you're not with Mr. Roth on coercion on takings, we nevertheless have the actual compulsion required for this to be compelled speech. And because it's compelled speech, you've just got to ask yourself one more question. Is it expressive speech? Yes, it is expressive speech. And it's expressive speech because of the ways in which it's been used by the president and other senior government officials. MFP is, but agreement doesn't seem expressive. Negotiate doesn't seem expressive in the same way that MFP does. I mean MFP is making a normative judgment about the pricing. The fact that you're discussing an agreement, I don't know. I just don't. I see a distinction. Why am I wrong? Well, Your Honor, I think we agree that MFP is the easiest and most obvious part of this. But I think I see a spectrum here. Agreement, if it was just an agreement by itself and it didn't have negotiate and it didn't have MFP with it, that might not be a problem. But it's an agreement to something in particular. It's an agreement to negotiate. When we think this is not a negotiation, we've got it down to our head essentially throughout. And this is not the kind of arm's length negotiation. That sounds like your compulsion argument is derivative of the coercion right. It's just similar. It relies on similar facts. But I guess my point is we don't think this is a negotiation. And the fact that this is labeled as a negotiation has this tremendous messaging effect. So tremendous that, again, you've got the president saying during the State of the Union that we brought the manufacturers to the negotiating table. Congress all the time sets these programs without a negotiating element, without. You know, in terms in terms of the range of decision making, though, and the consequences, the decision making. Don't you think that I think the student in Exxon might be the right case? You know, they didn't have quite the same options. You know, these are huge companies with with with a lot that they can do. And so you kind of assume that, you know, you're going to be able to work with our conditions a little bit more and push back a little bit more because you have more leverage. You know, the inequality of leverage feels to me like it's not the same degree as it was in that case. The options might be kind of the same, but if your leverage is different, maybe you don't have to worry about the worst case scenarios quite as much. Is that does that matter? Should we look at kind of the negotiation leverage disparity at all when we want to look at compulsion? Your Honor, this neither this court nor any decision that I'm aware of has ever looked at that factor. What the court has said is, are you subject to discouragement? Are you subject to fines and taxes and exclusion and things like that? That's what we have here. I think, you know, the extent of the bargaining relationship has never been a part of these cases. And I guess I would submit that it shouldn't be a part of the analysis. And the reason it shouldn't be a part of the analysis is it would treat parties differently. You would come in and say, well, big companies have fewer constitutional rights than small ones or people. That's just not part of the constitutional law, Your Honor. So I think. But I mean, I mean, fair like like like that strikes me as fair. But at one level, you know what it takes to compel, you know, a heavyweight might be different than what it takes to compel a lightweight. And so, you know, at some level, we do have to consider kind of, you know, who's in play or is the answer no. Same standards for featherweights and heavyweights. The Constitution is just doesn't care compulsion for for either. There is no there is no case that says that the compulsion is different depending on who the party is. And you had compulsion in Pacific Gas and Electric. I mean, that's a big heavyweight company. And yet you had that kind of of compulsion. You had schools in a circle school case versus PAPR. These are, you know, wealthy schools, private schools. And yet they nevertheless were given the same protection. So I'm not sure I see any difference on that point. That's that's Constitution regulates speech, not speak. Or maybe I don't know. I don't know where that comes in. But, you know, something like that. I see that my relatives in reserve time will hear your rebuttal after we hear from Patty again. Please, the court. The plaintiff's First Amendment claims rest on a fundamental mischaracterization of the negotiation program. The program does not compel manufacturers to adopt or endorse any government viewpoint. The use of the phrase maximum fair price is a statutory term of art that is defined in the statute to describe the price agreed upon through negotiations between the government and manufacturers. It is a legal and commercial term used in the context of the specific statutory program, and it does not reflect a subjective value judgment or an endorsement of fairness by the manufacturers. And if there were any doubt about this, the agreement explicitly disclaims any endorsement of CMS's views or any colloquial understanding of what it means for something to be fair. It says that the terms in the in the contract are to be understood only according to their statutory definition, which is just that it's the price agreed upon through these negotiations. There's no government compulsion of ideology here. So could we solve the problem by just striking maximum fair price out of the agreement? Well, Your Honor, the question of remedies comes much later than the question of whether there's any speech implicated here at all. This is a government contract. Plaintiffs both recognize that First Amendment concerns are not ordinarily raised in government contracting spaces. And I couldn't imagine a world in which plaintiffs, you know, in all sorts of procurement negotiations with the government, come in to ask the court to change the terms of the contract. It's also clear that just because something is part of a contract doesn't mean it's not speech, right? And there is a communicative aspect to signing this. Wouldn't you agree? No, no, Your Honor. I'm not only at best an incidental expressiveness. The contractor memorializes the terms of the negotiations, memorializes the price that they agreed to and does uses the statutory terms in a way that promotes consistency and clarity. Is this a material term of the contract or not? Your Honor, it is. It is material in the sense that it does reflect the. So you understand where I'm going with this, right? Because you're telling me it's incidental, right? Incidental burden on speech, but it's a material term of the contract. There's a duality there that I know there are different spheres, but that's a little tricky, right? It's material for one purpose, incidental for another. It's kind of hard. No, no, Your Honor. The question and there are a lot of extremely important terms in contracts. The question is whether a government contract has any more than an incidental effect on speech. And as plaintiffs recognize, that is ordinarily not true. And it is not because the terms of the contract are not important. They are very important to the contract and to the parties who negotiated for these terms. But they is nonetheless a legal and commercial term. It's ordinarily true because it's it doesn't happen, right? I mean, there are there are hordes of cases where the government is setting rates, correct? Yes. I mean, the rate cases for energy for that. I mean, I think the phrase that's most common is just a reasonable rate. Is that right? Yes, Your Honor. Federal acquisition regulations require a fair and reasonable price. Perfect. Yes. So the FARs and the DEFARs. I mean, there is a lot of money being spent in that area in the defense area. Right. So in all of those cases, as far as I understand it, the government is saying the government is speaking. Government is saying as the sovereign, here's the rate and it's the just and reasonable rate. That's the obligation of the regulatory bodies to do this over and over again. Here we have the inverse of that. Gets back to my fundamental question, which I'll stop belaboring about why, why it didn't happen that way. In this case, do you have any other cases where the government set a rate? Through negotiation and required by statute. That the private party doing business with the government acceded to the government's definition of it being a fair price. Is there ever happened before? I don't I don't have a case that uses terminology like this because it is a specific term that is used in the court like it. I mean, the words fair price aren't aren't so exotic. Those are basic words. Has the government ever required the private party to call something in a contract a fair price? I don't I don't have any examples just just like that, Your Honor. I will say that the government does negotiate all sorts of prices. It's not just. What do you have close to it? If you don't have anything just like it, what do you have? What's your closest exemplar of that? Because I've got to me, it seems rather binary. I've got all these incidents and cases where the government is setting rates, setting prices, declaring as the sovereign that they're just and reasonable. I'm asking for something on the other side that's close to the government requiring a private contractor to say in the agreement or by statute that the price is fair. So I understand that in federal, the federal acquisition regulations, that the government cannot agree to a price that it does not deem to be fair and reasonable. I don't know how often that term shows up in the resulting contracts, but I do know here that the use of the statutory term and the explicit disclaimer that the term is to be understood as anything other than its statutory definition does relieve any concerns. I'm asking about the consistent with Judge Freeman's last question. I'm asking about the statutory definition itself. There's to me, as I read it, disagree if you wish and explain why you disagree. But those words to me, maximum fair price, it's a normative judgment. It might be oxymoronic in some regards, because I don't know what maximum fair, what they seem to be working against each other there. I thought a fair price was what a willing buyer would pay a willing seller. And that's what happened here, Your Honor. The government did engage in negotiations with these parties, and this is the price that they agreed to. The court has explained, for example, in the Meese v. King case, that the use of the phrase political propaganda in the statute is defined according to particular terms. And anybody sophisticated enough to look at the agreement and to look at what, in that case, the FAR registrants were saying there would also be sophisticated enough to look at the definition. And that when Congress has imposed a definition, that term is not supposed to be understood outside of the statutory definition. Judges don't second guess Congress. If they want to define a term, a statutory term, that's fine. They're free to do so. We don't have to assume it has its colloquial use. But the issue is whether the plaintiffs in this case need to sign a document, an agreement, that contains those terms. And so we're not touching the statute. I recognize we don't have the authority to order a change in the agreement. But if there is some communicative aspect to having plaintiffs sign that agreement, then what do we do with that? Your Honor, we recognize that when there are contracts, there's always going to be some incidental effect on speech, but that incidental effect does not raise First Amendment concerns. The use of the term maximum fair price has an explicit disclaimer in the contract so that nobody is confused about what the term maximum fair price means. And so all the manufacturer is doing is putting their signature to that paper that, yes, uses the phrase maximum fair price, but that also explains that the phrase is not to be understood according to any colloquial meaning or understanding of fairness. It is just according to that statutory definition. So their speech and First Amendment interests truly are not implicated here. And they try to equate this adherence to statutory terminology in a commercial agreement in a voluntary program to core ideological expressions that were at issue in some of the landmark First Amendment cases in the past century. And that to some extent trivializes the interests and the freedoms that those cases protect. This is a specific commercial and legal term used in a specific statute with a specific definition and a specific disclaimer. So if they object to that, they don't have to sign the agreement, but the government... Is it not like AID though? Absolutely not, Your Honor. In AID, the recipients of the program had to adopt a policy saying that they oppose prostitution. This is the opposite. This says that... Didn't they just have to make a statement that they oppose prostitution? I think they had to adopt a policy which made it different from some of the other unconstitutional conditions. They were afraid that that would offend some of the governments where they were doing their work, right? I'm not sure who was afraid, Your Honor. Well, the organization that challenged the regulation was essentially saying, look, we're doing good work in these countries, and if we put this in here, it's going to impair our ability to do the work because some of the governments aren't going to like what we're putting in here. And the court in AID said that the problem with that was that it was imposing a condition on the grantee of the program instead of merely setting the... It was going beyond the scope of the program and imposing the condition on the grantee itself. And in Rust, for example... But here, just relate that to this case, though. I think their argument is that this isn't just about the government being able to say we've got a maximum fair price. It's a way to lower drug costs for the other half of the country that aren't part of Medicare and Medicaid because it's going to be very difficult for them to go into the private market and charge more than they're charging here, right? Is that their argument, that it's going to impair... The same way that the social service agency was saying it's going to impair our ability to do our work if we have to say this, they're saying it's going to impair our ability to sell drugs in the private market if we have to say this. So first, they don't have to say this because the disclaimer in the contract makes it absolutely clear that they are not saying that it reflects any subjective judgment about fairness. But second, no, and in Rust, for example, the court explained that the... It's not a subjective judgment about fairness. It has the word fair right in it. I mean, that's doublespeak, isn't it? Well, Your Honor, they do raise this concern and Janssen offers an alternative and says, why couldn't they have just used maximum price? But if they use maximum price, I don't see how that addresses their problem at all because then in their negotiations with outside parties, they would say like, well, you know, here you did agree that this meant maximum price. I mean, there's the... Well, the answer there is, well, it's maximum price because the government said it was maximum price, but it's certainly not a fair price in their view because to them, fairness is what a willing buyer would pay a willing seller. But it's not about to them. It's about the statutory definition and the... Well, either way. You're saying just whatever the phrase is, their argument is it's compelled. Now, it may be more misleading if it says one thing or another. If it says the price that rips the consumer off, that's what we're going to call the statute. That's a little more problematic, but it's compelled no matter what the message is, right? So I guess does content bear on incidental? The bigger a term it is, the greater likelihood that it can be construed as something it's not. The less work a disclaimer does and the more it feels something other than incidental. So I guess what I'm saying is does the message itself drive the incidental analysis? No, Your Honor. The term itself, maximum fair price, is a term that is used in the statute and not anywhere else. It's not something that… Your Honor, there may be a point at which it starts to seem as though the term that they are objecting to is not really a legal and commercial term that is simply porting the language from the statute, but that's not what we have here. The term maximum fair price does not show up in normal discussions, does not show up in colloquial context, and it has a statutory definition. It has a disclaimer in this contract. They are simply adhering to the statutory terms in putting this into the contract. That's not a constitutional… So what about voluntariness? I thought your lead argument here was voluntariness. Like you said, no compulsion, just none. What do you think? You still sticking with that, or you think that you've heard enough that maybe that's not the way to go anymore? No, of course there is voluntariness here. This whole program is voluntary. The government can absolutely set the terms of the agreement, and we were starting to talk about Rust. The court explained in Rust that there is no First Amendment problem because the providers could set up affiliates and that the affiliates themselves could provide abortion counseling, even though the recipients themselves of the Title X funds could not. And so the fact that that itself was understood in Rust to alleviate any First Amendment concerns means that this argument that the use of the term maximum fair price, a statutory term with a statutory definition, and that disclaimer pales in comparison to the work you would have to go to in Rust to set up a new affiliate. And even that was… Is there an analogy to Rust that because plaintiffs can issue a press release and put up billboards saying that this really was not fair, then that alleviates the concern of having them sign this agreement with this term? So their freedom to do that, of course, is relevant to the analysis, but I do want to emphasize that the expression that they are objecting to here is their signature of the document. So the document uses the phrase maximum fair price, but it also has that disclaimer in it. So it's not a separate sort of something that removes any… that undoes something that they were required to speak. It clarifies that they were never required to adopt any viewpoints. But they also have the term negotiation, right? So that's in there, and it's without a disclaimer. Yes, Your Honor. It's hard to see how when the government and manufacturers discuss prices back and forth, the government sometimes agrees to the price that you don't call that the negotiation in the end, and putting that into a government contract is just part of how the government operates in procurement contracts. Similarly, the whole thing is a contract, and it's premised on agreement, so you have to have some kind of agreement to sign the contract. So what about the fact that compulsion is probably a lower standard than coercion? Do you think that this isn't… I'm curious for why you think that even if it doesn't rise to the level of coercion, why it's not compulsion? Because, Your Honor, like in REST, the providers were compelled to not provide any information about abortion counseling unless they set up an affiliate that would itself do that. They needed those funds to survive to set up the whole program, but the use of the government funds is an incentive that the government can offer. The incentive is not understood to be any kind of compulsion. It's just the government saying that funds can be used for the purpose that the government authorizes them to be used for. And the government is allowed to do that, and it did so in REST, and it can do so here. And I do want to be clear that we are not arguing for a blanket exemption from constitutional scrutiny whenever the government is acting as a market participant. When we make that point on page 50 of our brief, absolutely clear. The point we're making here is about the inapplicability of the unconstitutional conditions doctrine in constraining commercial terms in commercial negotiations. The doctrine has never been applied in a case like this where the government is paying for goods and negotiating price agreements. Claimed disposition here would transform all sorts of government procurement contracts into potential constitutional claims, because any time the government sought favorable pricing terms in the contract or used a statutory term that Congress defined, even with the disclaimers that CMS has put into these contracts, the vendor could claim an unconstitutional condition. That's not what the doctrine was meant to address, and that's why the courts are not flooded with lawsuits from all manner of defense contracts, for example. Defense contractors, for example, could depend on government contracts to survive, arguing either that they object to a term in the contract or that the price that the government is trying to buy their fighter jet for is too low, but they couldn't survive without the government contract. There's just no unconstitutional conditions here when the government is setting the terms on which it spends its own money, and that is all that has happened here. If there are no further questions, we ask this court to adjourn. Thank you very much, Ms. Potti. A rebuttal from Mr. King. Would you mind, I'm sure you have several points you want to make, but would you start where Ms. Potti left off with her last point? Yes, Your Honor, I'd be glad to. Ms. Potti is incorrect as a matter of law. We have Supreme Court precedent in the Umber and O'Hare cases, both of which involved the government contracting for and acquiring services. In O'Hare, it was towing services. In Umber, it was trash hauling. But in both cases, the Supreme Court applied the unconstitutional conditions doctrine and said the government may not retaliate against or condition providing the deals for those services on particular kinds of speech. So it's just incorrect as a matter of law, plain and simple. On the disclaimer, Your Honor, that Ms. Potti referred to many, many times, again, as a matter of law, the government is incorrect. Footnote 11 in Pacific Gas and Electric could not be clearer. The disclaimer there, there was required to be a disclaimer at the bottom of Tern's newsletters that that wasn't good enough. And this court has said it's not good enough. If I could, I'd just like to read two sentences from this court's decision in Circle Schools versus Pappert. And the fact that the schools can issue a general disclaimer, along with the recitation, does not erase the First Amendment infringement at issue here, for the schools are still compelled to speak the Commonwealth's message. Otherwise, the state may infringe on anyone's First Amendment interest at will, so long as the mechanism of such infringement allows the speaker to issue a general disclaimer. That forecloses the government's argument on disclaimer. On USAID and Rust, Ms. Potti referred several times to Rust, but Rust was not a compelled speech case. USAID came in later and was a compelled speech case. And you had that second condition in USAID that required the grant recipients to, in the award documents, to promise, to say that they have a policy against prostitution. And that, the court said, is fundamentally different than what happened in Rust. And the court said, and now I'm quoting again, that by requiring recipients to adopt, as their own, the government's view on an issue of public concern, that that, by its very nature, affects protected conduct outside the scope of the federally funded program. That's what we have here. And just to come back to something I said during this.  Outside the scope. How is this outside the scope? So this is outside the scope of the program, Your Honor, first, because compelled speech just is categorically outside the scope of the program. But second, that's USAID. But beyond that, again, what seems to be right in the heart of the program, because what they're trying to do, a laudable goal, is to reduce this runaway train of federal budget deficits, at the same time providing quality health care to citizens. Yes, Your Honor. But the government in USAID was trying to stop prostitution. It was right in the heart there, too, but the compelled statement came out of it. And second, even if you don't agree with me on that, Judge Hardiman, the government can reduce these prices here without requiring us to say that they're fair, without requiring us to say that they're the product of negotiation when they're not the product of the negotiation from our perspective. So it's not in the heart, in that respect, in the sense that Congress could have set up a very different program that didn't have. Well, that gets to the Sub-Rose issue, which is, you know, what this is to some large extent about is also bringing down health care costs for the other half of the country that's not on Medicare and Medicaid. That's your position, right? Well, yes, Your Honor. Yes, there is. But how do we know that? Well, Your Honor, you can know that in part. I'd be suspicious of that, but I don't see anything telling me that that's the case here. Well, Your Honor, I don't think you need to know that or not. I agree. I can't prove that. I don't have some facts to prove that. But what I can say is that words are being put in our mouth here, and we disagree with them, and they relate to an issue of public concern. I don't think there can be any dispute that drug pricing is an issue of public concern. And so that alone under USAID is sufficient. You don't need to know, well, it was exactly because they were trying to influence the Southern market. But you can know, it's telling, my colleague on the other side conceded up here, that there is no other federal program, not one, that has this layered-on, gratuitous negotiation and agreement framework. There is no case that upholds that kind of regime. This is a one-of-a-kind federal program, and because it is, ruling against it here would be a narrow ruling. So do you think that the – I mean if you had a hierarchy, do you think that the phrase negotiation and agreement are more incidental and maximum fair price is less incidental? I mean it's kind of weird, but incidental somehow seems to suggest that we're making a little bit of a content-based judgment, at least a little bit of one, because of the – we seem to be wading into that. So negotiation agreement, maybe those are incidental, but maximum fair price isn't? No, Your Honor, negotiation is not incidental. And negotiation isn't incidental because it's putting words in our mouth about what's happening here, about something that matters a great deal. There was debate in Congress. We cite a statement by Senator Crapo in our brief that says this is not a negotiation. This is strong-arming. There is a big disagreement about whether or not these are negotiations, and yet we're being required to take sides on that disagreement and to say yes, this is a negotiation when we believe it's not. When the government puts words in a regulated party's mouth and says you need to speak our preferred message on this on a matter of public concern, that under USAID and the other cases is expressive conduct under the First Amendment. And the fact that it relates to pricing, Your Honor, I just want to impress Expressions Hair Design. I mean that was not the world's most expressive speech. It was how you communicated your prices. Could you say $10 with a $0.30 surcharge? And yet that was held by the Supreme Court to be communication about prices. Negotiation is speech about the prices set by CMS, the process that led to those. So in terms of remedy, I mean, what are you proposing? Just say strike those words, strike the whereas clause? What do you come to us with? Well, you can get our requested remedies at pages 472 to 73 and 80 to 81 of the Joint Appendix. We're requesting here a declaration declaratory judgment that the program violates the First Amendment as applied to these parties and injunctive relief, which is standard and First Amendment cases saying you can't apply these conditions against us. These unconstitutional conditions. That's what we're asking for. We're not asking for anything broader than that. Thank you very much, Mr. King. Thank you, Miss Potty. Double duty. Congratulations, Mr. Roth. We thank you as well. We're going to take these cases and revise it. We're going to take a brief recess while we get set up for the next case. All right. We are back with the AstraZeneca part of the case. Good morning, Your Honors. I may please the court. My name is Kate Stetson. I represent AstraZeneca. I'd like to set aside five minutes for this case. This case also challenges the drug price negotiation program and challenges the guidance that CMS put in place to implement it. We brought three claims. The first two have to do with the guidance and the way that the guidance is not, to quote Judge Hardiman, in harmony with the statute that it purports to implement. First, the statute provides that CMS may not select qualifying drugs for negotiation unless they've been on the market for a certain number of years. The guidance specifies that different drugs approved at different times under different new drug applications can be lumped together for negotiation subject to one price regardless of when those drugs were approved. Second, the statute prohibits CMS from selecting a drug for negotiation where a generic equivalent has been marketed. The guidance introduces a new concept. Is the generic drug subject to robust and meaningful utilization after it comes to market? Third, there's a constitutional valence to this case as well. The federal program denies manufacturers meaningful due process at every stage from the guidance, which was not subject to comment, through negotiation, where, as you've heard, the government holds all of the cards, to the final price, which is not subject to judicial review. That series of roadblocks, we contend, adds up to a due process violation. The district court concluded that AstraZeneca lacked standing to challenge the guidance. But AstraZeneca's declarant in this case repeatedly attested to the fact that the unlawful guidance was currently damaging the company's research priorities. That is cognizable Article III harm. There was no further need to specify exactly what roads were not taken in those circumstances where this court has said the bar for showing injury under Article III is very generous. So when you talk about standing, you said very, very few Third Circuit cases. I think the only one you cite is Executive Farm, and Executive Farm is just a different case. That's a beta leak, right? You've given us D.C. Circuit cases from the 1990s where they talk about decision-making. In the 1990s, everyone didn't know if Lujan was the plurality mattered or didn't. We've passed that stage. But we've never said that. We've never said that just some, you know, abstract harm to corporate decision-making cuts it. So you come to us with a brief, very little in our circuit's law, and with a standard that was grounded from another circuit from another time. Why should we – why does research priorities, you know, just general harm to research priorities? I would get it if your applicant said our R&D portfolio, the valuation of our R&D portfolio has gone down. If we wanted to sell it, we could have sold it. It's just less now because our NDAs and our new drugs, we're in bad shape now. If you show up with that, of course that's standing because that's – even though R&D is kind of speculative in its own right, it can still be valued in a concrete way. But if you just say, no, you know what, we have to – we kind of have to rethink some of our research priorities. Like, we've never said that before. So I want to start with this. I have two responses to you, including quoting you a couple Third Circuit cases that we cited in the brief. But first let me start with this idea about general research priorities. I agree with you that if you had a company come to you and say, no, there's this new regulation. We're kind of worried about how it impacts us, and, you know, it's just making us think about all sorts of stuff. That would not constitute standing. But here what you have is a declarant that says this regulation is impacting our thinking on this drug, Farxiga. We have things in the works that have to do with the active moiety in Farxiga, not just some random general angst about regulatory action. This has to do with this drug, this active moiety, these research priorities. That's the specificity that you'd be looking for. There's one sentence, right? He says, there are other ongoing drug development efforts involving the same active moiety as Farxiga, where one development pathway could result in the product being treated as the same hue SSD as Farxiga. So, I mean, there's a lot of speculation in there. And all he says is there's some things happening. How do we know that that has any impact on what's going to happen with regard to this guidance, which is only in effect for 2026? So, Judge Friedman, first of all, the guidance just got reenacted verbatim for the next year. Second, and I do want to come back to your third circuit question, Judge Phipps, but just on this, that's why I started with the road not taking point. This kind of industry, of course, as you know, as our declarant said, you have circumstances where people are making decisions years in advance of anything actually coming to fruition. Now, the government argues that that's a bug in our standing argument. That is a feature of our standing argument. And the reason why we pulled those cases from the D.C. Circuit, Judge Phipps, has to do with those are the cases that we found that involve these kind of long tail regulatory processes, the Great Lakes case, involving something that wasn't going to happen, if at all, for 15 years. But the case that probably is closest to home in the third circuit that we set in our brief is vote choice versus DeStefano. And the reason I mention it is because that has to do with the campaign and certain strategy choices that were made at the beginning of the campaign. You don't know whether that person is going to win the campaign, but you do know under vote choice versus DeStefano that something that is impacting what that candidate can say and how that candidate can spend her money at the beginning of the campaign matters for further down the road. So it doesn't have to show harm right now. It can be harm to our thinking, our research priorities for this active moiety, not just some general angst, as I said. And it has to be... Don't you have to show that, like, that in addition there would be, you'd make less money if you change your research priority? I mean, there's always a judgment call about research priorities. But, like, if you sit there and say, hey, we got forced into doing this. We chose. We made a different decision based on what we saw. We're still making money probably, or it's still not a bad decision. Like, where is that a concrete and particularized entry in fact? Like, I would just expect you to say if we sold our research portfolio tomorrow, it would sell for less. That works for me. But if you sit there and say, you know what? It just – it harmed our research decision-making in an abstract way. I said, well, portfolios sell for less or more right now. If it would sell for the same, then it feels really weird to tell me that – tell us that, no, there's been an entry in fact. Don't you have to say sell for less? We spun it off right now. Sell for less. You got standing then. You know, our decision would be a little harder to make right now. It might still sell for the same, though. Has it really been hurt? No, I think there's a couple different strands there that I want to focus on. The first is I don't think it is an answer to our standing contentions to say that if they had been more specific in a different way, we would have standing. We certainly have standing under your theory. But the question under this court's very generous injury in fact requirement is, is saying that we are not going to pursue research avenues that could lead to a subsequently approved drug being lumped in with a cheap price for Farxiga causing us harm. I think it's implicit that we would make less money. What does your declarant say? We are not going to pursue those drug development efforts? I think paragraph 23 and again at paragraph 30 and 32. The declarant specifically talks about in paragraph 23 is the one that you quoted Judge Freeman, which is we have clinical trials, which are the ones all the way down the road. The declarant is very forthright that those don't involve, you know, an active moiety that would be approved under a separate MDA. But that's the end of the process. That's the end of the funnel. What we're talking about is the top of the funnel. There are other things, he says, that are in process that do involve the same active moiety. He says even, he says now in paragraph 30, he says even pre-selection AstraZeneca has to make investment decisions now on research development. But he doesn't say, and we're not going to continue that development. He doesn't complete that thought. All he says is that we're making decisions. They are making decisions. And the decisions are necessarily informed by the fact that this drug that AstraZeneca would spend billions of dollars developing wouldn't recoup the billions of dollars that were spent if it is charged under FARC-CEGA. I think that's implicit in what the declarant is saying. And let me just put a finer point on this if I could. One of the problems with what the government is contending here is that AstraZeneca is, and all other manufacturers really, are between a rock and a hard place. The government is saying we don't have standing because we haven't shown specifically enough that this drug was chosen and it's going to impact our bottom line in a particular way. I guarantee you if we came in talking about the challenge to FARC-CEGA, the government would say you're barred. Choose your analogy. We are damned if we do, damned if we don't. What we are trying to do is to say this choice of FARC-CEGA, we are not challenging. We're not challenging the data that brought us here. We're not challenging the selection of FARC-CEGA. But that selection has consequences for the way that we value our portfolio, for the way that we value our products, and for the research choices that we make. Were all those arguments made in the district court? They were, yes. Just by counsel or by the declarant? By the complaint, by the declarant, and by counsel, yes. Evaluation of the portfolio was in there? The evaluation of the portfolio, I don't think that language was in the declarant. It certainly was in the complaint and in our arguments below, yes. If there are no questions, further questions, I'm standing. I want to touch briefly on the judicial review bar because that's the other end. We're still on standing just for your first point, right, because there's also a standing challenge to your second point. Yes. Okay, but you're sticking with the first point right now, the judicial review bar? I can talk about standing for the second point, whichever you would like. Okay, judicial review bar. So the issue that the government has is that there are ways that Congress writes a judicial review bar that are very broad. And we cite a Third Circuit case in our brief. It's United States v. Duho from 2020. That statute strips, and now I'm quoting, jurisdiction to review or to entertain any other cause or claim arising from or relating to the implementation or operation of a particular agency action. That is a broad judicial review bar. What you have here are very targeted bars, selection of drugs, determination of negotiation-allowable drugs, determination of qualifying single-source drugs. And if you look at all of the cases that the government cites in support of its idea that those judicial review bars extend to the kind of interpretive issue that we are talking about here, both with respect to the first and second guidance problems, what you will find is that in all of those cases, most of them involve the same Medicare reimbursement judicial review bar. And in all of them, the hospitals were generally coming in and saying, cloaking their claim for more money in something different. They were coming in and saying, we're challenging not your reimbursement, but just your methodology. But what we'd like you to do at the end of our complaint is give us $17,000 more a month. Each of those had to do with exactly the kind of thing that was barred. Here, we're not challenging, of course, as I said, the selection of Farsiga. We're not challenging the determination that it was eligible for negotiation. We are challenging the impact that it has on AstraZeneca's ability to value its product with respect to that same active moiety, making it concrete and particularized as it goes down the road. My thought on this is I agree with you. This is a somewhat spartan judicial stripping provision. But you bring in the APA challenge, and there's other provisions in the APA. I'm sure you're familiar with 5 U.S.C. 704 that restricts review to only final agency action, and intermediate decisions or interlocutory decisions aren't reviewable. And so doesn't it make sense if you read the judicial review bar in conjunction with 704 to say, wait, what they stripped from judicial review was the final agency actions possibly at various steps along the way. It didn't need to do more because 704 already says don't come to us challenging the intermediate or the interlocutory decisions. Maybe that's until finality. But maybe if we read them together, the guidance itself wasn't maybe a final decision. And so if we bar review of the final decisions, don't we bar review of everything that could be wrapped into that? Two responses, Judge Fitz. First of all, this is not an argument the government made, so they waived the bar. But second and more importantly, when we talk about a bar on judicial review, we are starting, as this court has said, with a presumption of reviewability. And that strong presumption, which, by the way, is completely missing from the government's brief, that strong presumption leads you to look at the question, can you read this the way that we are saying it should be read? Or must it be read in the way the government is saying? And if we're already talking about a circumstance where you put that judicial review bar next to a couple other statutes and you sort of shake them a little bit and see how they fall out, those circumstances suggest that the judicial review bar that the government has to rely on in this case, the only ones that the government are relying on in this case, do not stand up to that presumption of judicial review, which is why the government chose not to mention it in its brief. I do see my time is up. I want to make one brief point, if I could, on due process. It actually follows from what we've been talking about in a way. The lack of ability to challenge selection, negotiation, or price, and the lack of judicial review at the end of the process all amount to a due process violation. Everything you have heard today about voluntariness is irrelevant in the procedural due process context that we are talking about, which is why, when the government gets up, she will not be able to point to a portion of the brief where they responded to any of the sites where we talked about this. Bowles v. Willingham, Goldberg v. Kelly, the Memphis v. Craft case. None of those sites are responded to in the government's brief. This is not a question of voluntariness, even if it were. Of course, it's involuntary for all the reasons you've heard. This is a program that, from stem to stern, denies these drug manufacturers due process. Thank you. We'll hear you on rebuttal. Ms. Powell? May it please the court, Lindsay Powell for the government. I'll go ahead and take the issues in order. The court wants to go in another direction, but beginning with standing, and I do want to make sure we hit both of the claims here, even though only one was addressed in the opening. The fundamental issue that plaintiff's theory of standing runs into, and this does apply to both, is a clapper problem. So they're not relying, they're emphatically not relying on a theory of future harm. The idea that they will be injured, they will experience loss down the road if the unlikely following series of events unfolds, that they develop a new product, a new dosage or formulation with the same active quantity as Sparziga, that is then approved by FDA under a separate new drug application, and that is then goes to market and is subject to the same negotiated price as Sparziga before there's any generic competitor on the market, as would need to be true in order for the negotiated price to be applicable. So there are all of these different speculative events that would have to occur, and looking at their own declarant, JA99, the likelihood of even that first step occurring, that a new dosage or formulation with the same active quantity gets to an approved drug application from the preclinical stage, they put it at 1 in 5,000. And that's just at that first step. These are very speculative future events. Everything about this industry is that speculative. If I can just follow up the clapper. Interesting, right? The government's spending so many hundreds of billions of dollars on medicines that are so unlikely to ever come to fruition. That's what the whole R&D budget's about, right? It does, but that is true, does not get them to Article III standing. But why? I mean, if the data show that it's very rare that a drug sort of makes it all the way through, isn't it sort of common sense that they would reallocate their resources about Sparziga? Because they certainly want to avoid the FDA approving something, another usage with the same active moiety, right? You can see that they, commonsensically, would want to avoid doing that because they're not even going to be able to make money for the—the exclusivity period's going to be greatly reduced. Isn't that the problem? What they're concerned about is that a newly approved dosage or formulation with the same active moiety wouldn't get to seven years under the statute. So that's what we mean by exclusivity, yes. They're not relying on the theory of future harm that I just spelled out. They specifically don't rely— But that's causing harm now because they have to move the decks on the, you know— Right. They claim they're on the Titanic. There are a couple things I want to say about the here-and-now theory, but I wanted to be clear first that they're specifically not relying on future harm. It's the here-and-now theory. And first, Clapper says you can't do that. Clapper says when your fear of being surveilled in the future is too attenuated, too speculative to itself support a theory of standing, you don't get to get around that problem with your theory by saying, oh, but I'm going to have different conversations now. I'm going to travel to visit my friends. We're not going to email each other. We're going to speak in code. Those are here-and-now things that the plaintiffs in Clapper were saying they were doing in order to mitigate their risk of future harms that were themselves too speculative. And the court expressly and emphatically said Article III does not allow that. You cannot get around— If they showed up with an affidavit that said the value of our research portfolio has dropped, they have standing? They say, you know, if we want to spin it off, we're a public company. We have to make disclosures in some regard about what the value of our assets are. It's dropped. If they showed up and said, you know what, it might be R&D. It might be something we're going to discover years in advance. But what someone's going to buy it for today, it's not the same. If they would have said that in the affidavit, do you think that you'd concede standing? Interim fact.  The full concession, but I certainly think that would be much closer. And I do think there is a passing suggestion that maybe some of this is in the complaint. But I think the idea of an affidavit, of a declaration, we're at summary judgment here. And so we need more than allegations. We need the appropriate level of evidence for this stage of the proceedings of the harms being alleged. And there is no evidence of that type of harm. So that's really not the theory that's at issue here. How basic is that, though? You know, we can make certain basic economic inferences. You know what I mean? If someone says, you know, you dug up the sidewalk in front of my business, do we need them to complete the thought and say the customers aren't coming anymore? I think it's not a basic inference by any means. If the question is, did this have a financial harm on the business? They have not put that in evidence. They have not said that. They've said, as we were looking at the declaration during the earlier argument, they've said only in the most generic, generalized terms. We're having to adjust decisions now to account for the possibility of these future harms. And again, that's Clapper. It's also not the D.C. Circuit cases they rely on. They pull some lines out of those cases, which, again, are not Third Circuit cases. Third Circuit cases are not recent. But they also don't say the generalized business decision-making support standing. Those involve very concrete and specific decisions. And I'd be happy to go through them. But in Clinton's Supreme Court case, the Farmers Cooperative adduced evidence that it was engaging in specific negotiations structured around the canceled tax benefit to acquire processing facilities. It wasn't just that they had to think differently about how they would run their business because of the canceled tax benefit. It was that specific transactions were being affected and that they had used evidence of that. And Sabre, the same thing, the newly regulated ticketing business, was no longer allowed to use display bias as a way of marketing and making money. And it had evidence that it had specific plans using that tool ready to go and that it would suffer losses as a result of not being able to use them. So it wasn't just – I mean, there is language in these cases about, you know, describing these as business decisions. But business decision-making is not a theory of standing that the courts have recognized on that level of generality ever. And this court should not be the first to do so. It requires much more specificity and concreteness. And we do have that in another case. These are simply the wrong plaintiffs to establish an injury. We have a plaintiff in another one of these cases who says, these aspects of the definition affected your selection of my drug. That alleges an injury in fact, which these plaintiffs don't allege. They acknowledge that the selection of Harziga was not impacted by either of the challenge aspects of this interpretation. And that's why we end up spinning this out in these very attenuated ways that don't establish standing. So the theme is true. The factual analysis is a little bit different. I'm happy to get into it with respect to bona fide marketing and the ways in which that's attenuated. But it suffered from the same problems. And fundamentally, what plaintiffs object to there is they say that they're worried that they might be subject to a period of time where Farziga could be subject to a negotiated price, but also generic competition, that there might be a generic competitor. And the statute itself contemplates that. It's Congress that set that deadline that said you need to show that there needs to be a determination of generic marketing nine months before the applicable price year. And if a determination isn't made before that nine-month period begins to run, then the drug is subject to the negotiated price in the following year. Can I just ask you a question about the judicial review provisions and then the due process claim? Sooner or later, you almost could win too much in terms of if you're right on judicial review and it is judicial stripping, at the end of the day, it feels like, wait, maybe that's a due process problem because no one's ever come to court. A lot of government action, a lot of consequential government action escapes judicial review completely. And so a little weird there. And so do you think – what do you think about the judicial stripping provisions? Start there maybe because I think it's spartan for judicial review stripping in terms of what we see in others. And then we've got – it's a substantive canon, but it's a meaningful one, which is that we've got a – although courts are courts of limited jurisdiction, there's a presumption in favor of the exercise of that jurisdiction. So what do you think on that? There is a presumption, Your Honor, but once you have an express provision, as we do here, unquestionably, the question just becomes what's the scope of that provision? And that's a question of statutory interpretation. And so the key language – and there are several clauses, but to take one of them – determination of qualifying single-source drugs under 1320F1E. And I want to make a couple points about that. First, under 1320F1E, so determination under that provision, that provision is the definition of qualifying single-source drug. So the statutory review bar is referring to the determination of that term under the statutory provision that defines it. And that's precisely the question presented here in this APA claim. Did the agency reasonably interpret that provision? And again, that's the provision in the bar. This court's decision in Bacron – and I point you to 894F3-563, this case is cited in their reply brief – the court construed the meaning of determine in a slightly different review bar from the immigration context. So it's not one of these other Medicare cases, but it was the word determine that dictated the scope of that term. And that's the same thing that we have here with determination. And the court very specifically said determine doesn't just mean the decision ultimately reached. It also encompasses the process of arriving at that decision. And that's consistent with these other Medicare cases, many of them involving estimates for disproportionate share hospitals, where courts have said estimate doesn't just mean the specific number that you arrived at, but in various different ways encompasses the methodology and the process and the data for getting there. But if you're right, we see other jurisdiction review-stripping provisions like in immigration law where there's a carve-out that still says, look, you can still bring a constitutional claim. And so here there's no carve-out. At the end of the day, if you're right, it's just like, no, don't ever even think about coming to court. And so that's a little weird because at least Congress on other occasions has been somewhat concerned about giving people at least a chance to vindicate a constitutional claim. And maybe that's of no consequence here, but in the absence of just the strict rigidity of never, ever come to federal court and no judicial review, isn't that a due process problem at the end of the day if the government can do stuff and never be checked in court? So the plaintiffs have not argued that that would be the case. I don't take them to be making that. Their due process claim here is just a due process challenge to the statutory terms separate from the review bar. And the way we've construed this, I don't think should raise those concerns. These are determinations by the secretary interpreting and applying statutory terms. So squarely the APA claims we have here, and there's been no suggestion about also precluding constitutional claims, but that's not a position we're taking. But I guess I'm saying if your interpretation of the judicial stripping provisions closes the courthouse door, shouldn't we reject that interpretation in favor of one that would keep the courthouse door somewhat ajar? And my response is that I think the extent to which the bar shuts the door is not so broad to give rise to those concerns. It is limited to the specific items enumerated in the statute. Those items happen to encompass both of the APA claims here. So that's where we're arguing that it's at least that broad. But notably, plaintiffs say that this would preclude any and all review of the guidance. And we are not arguing that that's true. The guidance is not limited to the determination of qualifying single-source drugs or eligibility or selection. It also covers such matters, for example, as the civil monetary penalties that could be imposed downstream if the negotiated terms are not adhered to. So we haven't argued that the civil monetary penalties have anything to do with this review bar. But I guess what I'm saying is let's just say that the guidance on the areas that are precluded just offended equal protection. You know, to just target a suspect class in some way, oh my goodness, I can't even believe they ever did that, right? You'd say, no, you can't come to court. I don't know that we would say that, Your Honor. We haven't said that here. It hasn't been argued that that is an issue here. And courts have been reluctant to read bars to cover constitutional claims. The court doesn't need to do that. You're only being asked to decide whether their particular APA claims, which go directly to the meaning of qualifying single-source drug, whether that falls within the scope of a determination of qualifying single-source drugs under the statutory provision that defines that term. And it absolutely does. You can't apply the statute to qualifying single-source drugs without interpreting it and knowing what it means. I have a question about that definition. CMS treats multiple products approved under separate NDAs as one qualifying single-source drug, correct? Correct. If it's the same manufacturer. If they share the same active moiety. But the IRA doesn't define it that way. The IRA defines it by cross-referencing the definition of a covered Part D drug in the Medicare statute, correct? So we haven't fully briefed the merits of the APA claims here since we're just arguing these threshold issues. But the IRA does specifically direct CMS to use data that is aggregated across dosage forms and strengths. But that's right in there. That's in 1320F1D3B. And that's what CMS was relying on in construing the statute that way. But it appears that whether a single-source drug is a distinct covered outpatient drug is based on whether the product is approved through a distinct NDA or BLA. Is that right? Again, we haven't fully briefed these issues here. The parties do have different positions on the merits here. But I can tell you that what CMS was relying on, and it says this in the guidance, is that language in 1320F1D3B, which refers directing it to use data that is aggregated across dosage forms and strengths. And again, the 1320F1D is among the provisions referred to in the provision barring judicial and administrative review. And just briefly on bona fide marketing requirement, that seems to be inconsistent with the statute too, because the statute just says a drug is not eligible for selection if a generic is, quote, is approved and marketed, end quote. That's different than bona fide marketing. I disagree, Your Honor. And again, we have not gotten fully into the merits. But as the guidance explains, and you see some of this at, I believe it's JA283. I mean, is marketed, marketed is not a defined term. It can mean different things. And there's no reason to think, there's actually ample reason to think that it doesn't refer to de minimis or token marketing. And in an industry where you routinely see brand name manufacturers entering side agreements with potential generic competitors to avoid competition, to keep them from engaging in real marketing that could drive down prices, Congress is legislating against that backdrop. And so to read the undefined term marketed, to require something more than token or de minimis marketing, that is going to create that type of circumvention and gamesmanship is an entirely reasonable interpretation. And that's what CMS said there. I do want to touch briefly on the due process claim, if I may. Opposing counsel is right that this is fundamentally not about voluntariness, but that's a sideshow that there's some debate about who introduced the idea. But it was not the central point of the district court's decision. It's not the central point of our argument. The central point is that to state a due process claim, you have to be deprived of a protected property interest. And they have not. And in their briefing, they principally relied on an asserted interest. You're saying investment backed expectations does not make a property, right? Correct. In this context, in a highly regulated industry where we're just talking about what's happening within the scope of a government program, they do not have a protected interest indicating what the government will pay. And that's ultimately what this comes down to. They point to their patent interest. That's a real, real bundle of rights, but not a right that gives rise to an ability to dictate what the government will pay in the context of its Medicare spending. And that's that's what they're trying to do here to maintain a different set of prices that is no longer what the government is offering to pay. And they don't don't have that right. They don't identify a source of it. It's emphatically not part of the patent. Right. That gives them a right to exclusivity, which the statutory scheme honors. I thought that was their argument, was that you're you're essentially depriving of their of their exclusivity period by the way that you've defined the NDA and single source drug. The patent exclusivity period dictates when generic competition may begin, and that is not affected by the Inflation Reduction Act provision. So that's why we're in a position where even though there are approximately 17 generic versions of Virbiga. But I thought your argument before we started was that it's too speculative, not that it wasn't that it theoretically wasn't a problem. I thought your argument was, oh, yeah, this would be a problem, but it's don't worry about it. One in five thousand. So it's it's far too speculative. Well, whether I mean, we're not disputing standing with respect to due process. So this is just a fundamentally different claim, their due process claim from their APA claims. So I may be missing the thrust of that question. But with respect to. Well, I was going to the property interest issue that that I thought the way they argued it was and maybe I'm misconstruing their argument. Miss Stetson will tell me that I thought their argument was essentially that the way the scheme is set up. We have a very real risk that we're going to be deprived of our exclusivity period. Because of what you're doing, you're sort of fudging the NDA situation. Right, because the FDA gives you approval for different NDAs and then and then the Inflation Reduction Act does something different. And that that inhibits their ability to make money because it's a price on their exclusivity period. The generics are going to show up a lot quicker. And all of that problem, as they see it. Will immediately cause all sorts of reallocation of resources and harm. I thought that was their argument. Do you do you apprise their argument differently? I do. And I think there's there are some some different periods that might be termed exclusivity that we should be precise about. But there there is no question that their patent exclusivity period, the period where they get to be free from competition under the patent law, is not affected in any way by this. Not by the IRA, not by the way CMS is interpreting qualifying single source drug. There's a separate provision of the the IRA itself that says that you can only be a qualifying single source drug after seven and subject to a negotiated price after seven years of marketing. That's separate from patent exclusivity and other exclusivity provisions. That's just a term of qualifying single source drug. And so that that comes into the APA claims and and some of those other arguments. But in terms of what the patent interests entail, what that bundle of rights is and whether they're affected by that IRA, there's simply not. There's there's no. No impingement on a protected property interest that they have identified as a result of the statute. All right. Thank you very much, Ms. Powell. Rebuttal, Ms. Stetson. Thank you, Your Honor. I'd like to make one point on each of these three issues, but I'm going to start with the judicial review bar because I think the standing discussion leads us right into due process. I want to make one thing clear. I heard my friend on the other side say that when you have a specific bar on judicial review, the presumption of reviewability drops away. That's simply not accurate. If you look at the American Clinical Laboratory Association case that we cite in our brief, it cites the Supreme Court's decision in Kusama v. Holder. When a statute, I'm quoting now, is reasonably susceptible to diversion interpretation, we adopt the reading that accords with traditional understandings and basic principles that executive determinations are generally subject to judicial review. So the presumption still has a bearing. And because this judicial review bar is so narrow, the cases that the government cites in its favor simply don't stack up against what we're arguing. On standing, a couple different things. The first is you heard Ms. Powell distinguish some but not all of the cases on which we rely. You didn't hear her talk about Great Lakes. You didn't hear her talk about Vogt v. DeStefano from this circuit. You didn't hear her talk about the Cottrell case, which is the case that I quoted to you standing for the proposition that when you're talking about Article III injury, you were talking about a very generous standard. Second, I think with respect to the questions, Judge Fitz and Judge Hardiman, that you asked Ms. Powell about common sense, of course that plays a role here. These are common sense economic decisions that are being made. The courts talk about that frequently when they talk about the types of economic incentives that parties are drawn to or away from. That's the problem. I think it is common sense. It works for me. But your affidavit didn't say that, and the absence is really messing with me because it strikes me as really common sense. You have a person who gives an affidavit, and they leave it out. And so I'm sitting there saying, why did they leave something common? They're trying to get you into court by their words, and they left that out. And so maybe I don't understand the pharmaceutical markets well enough. Maybe they couldn't say that. And so why is the easiest way in not said? It's what my common sense tells me, but it's not what your affiant tells me. In between the two, maybe we should go with your affiant. I think what our affiant could say at this stage, and it goes to the point Judge Hardiman made about everything about this industry is speculative, I think was the way he put it. What our affiant could say is, here are the things that are at the furthest stage of development, the clinical trials. Those don't involve, he was very candid about that, those don't involve what we're talking about. But further up the chain, there are things that do. And that's why I mentioned the road's not taken. When you're talking about this kind of funneling of different research priorities into a circumstance where you can then lead to certain beta trials, then lead to clinical trials, then lead to an application, which hopefully leads to a decision from the FDA in your favor, that matters at the top of the funnel. Now, depending on whether you're a basketball fan or a hockey fan, you miss all the shots you don't take. That is the point that our affiant was trying to make. He couldn't get more specific than he did. It's not clear that things matter at the top of the funnel, but I think the question is, it seems equally plausible that at that top of the funnel, there's such a de minimis cost in continuing to experiment in the labs with various ions and the active moiety of Farxiga, that the company just actually hasn't changed its development pathways. Again, your opponent mentioned we are on summary judgment. We look to you to fill in any blanks. You do have our affiant saying that the company is making a number of decisions now because of the impact that this unlawful guidance has on its research priorities. The affiant wasn't able to say, here are the active moiety trials that we're engaging in because we're not at that stage. But let me tie this into the other standing point I want to make. You heard Ms. Powell say, there's another plaintiff in another case that was able to say, these are the drugs that were selected that shouldn't have been. Of course, the government in that case is full-throatedly arguing the judicial bar. They are saying, you are challenging the selection of those drugs, and surprise, you can't. So that leads to the last thing I want to say about due process. There is no opportunity to comment on the guidance, no opportunity to negotiate in any kind of arm's-length good faith. There is no opportunity to challenge the prices or the selection or anything that was said in this case. I'm not sure I understand how that could be a due process problem if we all sort of stipulated at the outset of this morning, now afternoon, that the government could just set a price schedule. No negotiation, no nothing. Just hear the prices, take or leave it. So if the government can do that, why is the gun to the head put upon negotiation that they're subjecting your client to somehow unconstitutional if they could just do none of it? Sure. I think at a very fundamental level, legislation itself is the process. So for all the reasons that you were talking about this morning, there was a reason that the Congress opted not to do that. It probably has to do a lot with optics. But if the legislation itself had gone through the legislative process of debate and contribution from the public about what that legislation should say, we probably wouldn't be here. But the legislation didn't do that. What it says is agency, you put out guidance, no opportunity for comment. Agency, you negotiate gun to the head. All of your products can get taken off this list. Agency, don't worry because there's no judicial review on the back end. That is the due process violation. It's particularly stark when, as you said, Judge Hardiman, there are- Yes. Because I'm not sure I appreciate. Tell me, I asked Ms. Powell about that and she had an answer. So what's your rejoinder? My rejoinder is our property interest is in our patented products. A patent is an unusual right. And you see this in the cases that we cited from the Federal Circuit in our brief. A patent is the right to practice and enjoy the practice of an invention. But as the Federal Circuit has repeatedly said, it also comes with a right to monetize that invention. And what the government has done here- I don't understand how that impairs your patent. They have created a scheme that artificially dampens the value of our patent. And let me put it in this context. When Congress passed the Hatch-Waxman Act and created all those exclusivities for drugs and biological products, when the Constitution was enacted and created Article I, Section 8, what those combinations of Constitution and rule and statute did was to create the expectation that when you have a patented product, you can sell it and recoup in the market what you spent. Here are the billions of dollars that you spent on this product. So when the government comes in and artificially constrains the value of that product, that is a dampening of the process. Is Congress passing a law cutting your knees off? Is that artificially constraining or not? I would say it is. Congress passed a law- That was very disadvantageous to your clients. I thought you've conceded or at least your co-counsel conceded that that was allowed. I would concede it's allowed as well. If that's allowed, why is this automatically invalid? It's because you can't exit or what is it? It's for the reason I mentioned earlier. If Congress were to pass a law that says everyone pays X dollars for Park Sega now, the law is the process. The outcome of the law is the due process. That doesn't affect our property interest. Our property interest has been devalued, but there was due process attached to it. The legal way. I see. Exactly. So here, what we're talking about is no comment, no negotiation, no judicial review. There's a veneer of negotiation. I mean, some of the prices were changed. We'll call it a veneer. Yes. All right. No further questions. Well, thank you very much, Ms. Stetson. Thank you, Ms. Powell. And for all the other counsel that argued today, the court is extremely grateful for the terrific advocacy and briefing. These cases are obviously of great importance and we'll do the best we can as quickly as we can. We'll take all of the cases under advisement. Thank you.